# Exhibit 5

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF ILLINOIS
 3                      EASTERN DIVISION
 4   FRANCISCO ROMERO,             )
 5         Plaintiff,              )
 6     vs.                         ) No. 15-CV-713
 7   MICHAEL P. ATCHISON, et al.   )
 8         Defendants.             )
 9
10         The continued deposition of MICHAEL P.
11   ATCHISON, taken via videoconference in the
12   above-entitled cause, before Mary Kay
13   Andriopoulos, CSR, on April 23, 2019 at the hour
14   of 2:34 p.m. at 100 West Randolph Street, 13th
15   Floor, Chicago, Illinois, pursuant to notice.
16
17
18
19
20
21
22
23   REPORTED BY:  MARY KAY ANDRIOPOULOS, CSR
24   LICENSE NO:   084-002248
```



McCorkle Litigation Services, Inc.　　　　1
Chicago, Illinois  (312) 263-0052

1    A.   Yes, to both questions or statements.
2    Q.   Yeah, sorry, I shouldn't ask multiple
3  questions.
4         So, you mentioned seeing the photo of
5  Mr. Romero and that refreshed your recollection
6  as to who he was.  Let's look at that.
7              (Whereupon, ATCHISON Deposition
8               Exhibit No. 1 was marked for
9               identification.)
10 BY MS. BLAGG:
11   Q.   So, this is a document, I will give you
12 a second to read it.
13        Let me know when you are done.
14   A.   Okay.
15   Q.   Do you know what this document is?
16   A.   It appears to be an administrative
17 placement report.
18   Q.   I'm going to ask you to look at the
19 next document?
20             (Whereupon, ATCHISON Deposition
21              Exhibit No. 2 was marked for
22              identification.)
23 BY MS. BLAGG:
24   Q.   It's an e-mail.



1  A.   The first page being No. 163?
2  Q.   Yes.
3  A.   Okay.
4  Q.   Now, this e-mail starts with an e-mail
5  from Sandra Funk who I believe at the time was a
6  transfer coordinator, and the e-mail discusses
7  that offenders -- one offender from Menard will
8  go to Stateville and two offenders -- it's
9  basically talking about inmate movement and then
10 you send an e-mail to a few people that says
11 review the ones coming to Menard that will be
12 placed directly into the AD unit phase one, come
13 up with a housing plan and coordination with N2
14 majors.  They will need to be single celled
15 instruments until walked through.
16       One of the things you say in there is
17 AI/Intel review the ones coming into Menard.
18       Was this document created pursuant to
19 that request?
20 A.   Yes.
21 Q.   And AI is Internal Affairs, right?  I'm
22 making sure I understand.
23 A.   IA, yeah.
24 Q.   AI is artificial intelligence.  I do



1 remember the contents, you know, and what the
2 source of that information was because remember
3 that's an advocacy group, that much of their
4 information is just taking word of mouth from
5 inmates, and it's not like they reviewed our
6 files or anything like that.
7     Q.  Right.  They didn't have access to the
8 work order that said actually that the B wing
9 North 2 had no heat or hot water, right, that
10 would have been an internal document that John
11 Howard wouldn't have had?
12     A.  No.  They wouldn't had that unless they
13 specifically asked for it, and I don't know if
14 we would have given it to them but maybe we did.
15 I don't know.
16     Q.  So, I'm going to switch topics and talk
17 about the administrative detention review
18 committee.
19         We established in the last deposition
20 the documents I did have showed that Mr. Romero
21 and the inmates in administrative detention
22 didn't receive reviews and hearings.  They got
23 reviews but didn't have hearings that they could
24 attend for many years while they were in



1  administrative detention, but there was an
2  administrative -- do you remember that?
3      A.   No.  Remember what, an administrative
4  what?
5      Q.   There were no hearings for inmates in
6  administrative detention for the first few
7  years, 2012 to 2014, I believe, when a new
8  directive came out requiring --
9      A.   Correct, there were no hearings nor
10 were hearings required.
11     Q.   Right.  So, I don't want to go over all
12 that again.  I just don't want to leap into
13 something without establishing what we've
14 covered before in your prior deposition, that
15 was, you know, almost two years ago.  So, you do
16 remember that they didn't have hearings for a
17 few years because it wasn't required, but they
18 did have -- there was an administrative
19 detention review committee, right, that met
20 every 90 days, they reviewed the documents for
21 someone's placement in administrative detention
22 every 90 days.  I don't want to get into the
23 details of that right now.  What I'm just
24 curious about is, do you remember when you were



1  a warden, who was on that AD committee that
2  reviewed the inmates AD status?
3      A.   I don't remember that there was a
4  committee at that point.  I remember that being
5  part of the language included in the policy that
6  was written in 2014.  If there was a committee,
7  I don't know if it was ad hoc or if it was
8  something that was locally put together, and I
9  certainly don't remember who would have been on
10 it.
11     Q.   Did you review the inmates -- I am
12 sorry, go ahead?
13     A.   Sorry.  The only -- the only thing I
14 recall is that administrative detention per
15 departmental 504 required that every 90 days
16 that status be reviewed.
17          How that review takes place was not
18 established or that granular level of guidance
19 wasn't established in this departmental group,
20 so I don't recall how we did it.  I just know
21 that a review is conducted by me or someone else
22 who made the recommendation to me, and I either
23 concurred or did not.
24     Q.   So, as warden you had the authority,



1  you were the final say in those 90-day reviews
2  if the person stayed in administrative
3  detention.  You signed off on the -- either the
4  recommendations or based on your own independent
5  review?
6      A.  I don't recall if I did an independent
7  review.  I recall that the warden has the final
8  authority.  Well, I don't know if it's final.  I
9  don't remember if the deputy director may have
10 had to review it as well.  I don't recall, but
11 yes, I know that I did -- that was my -- within
12 my authority to decide whether someone stayed in
13 administrative detention or not.
14     Q.  And so, I wasn't trying to misspeak, I
15 think actually you are right that there wasn't a
16 committee until they instituted the review
17 process.  Who would have been on the committee
18 at the -- at that time you had been promoted
19 right to chief deputy, I believe, by the time
20 they instituted the new procedures for
21 administrative detention?
22     A.  Yes, the deputy chief of operations.
23         MS. KOZAR:  What time period are we
24 talking about?

