# Exhibit 9

**MICHAEL P. ATCHISON  6/21/2017**

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
      FRANCISCO ROMERO,                )
 4                                     )
               Plaintiff,             )
 5                                     )
         -vs-                          ) No. 15 C 713
 6                                     )
      MICHAEL P. ATCHISON, et al.,     )
 7                                     )
               Defendants.            )
 8

 9

10

11        The deposition of MICHAEL P. ATCHISON,

12   taken pursuant to the Rules of Civil Procedure for

13   the United States District Courts pertaining to

14   the taking of depositions, taken before Pamela S.

15   Morgan, a Certified Shorthand Reporter in the

16   State of Illinois, at Sheridan Correctional

17   Center, 4017 East 2603 Road, Sheridan, Illinois,

18   on June 21, 2017, at the hour of 9:15 a.m.

19

20

21

22

23

24
```

**MICHAEL P. ATCHISON 6/21/2017**

```
 1    how many you got that were from Tams?

 2         A.    I want to say only five or six.

 3         Q.    And how many people in total were in AD

 4    while you were at Menard?

 5         A.    It's a range.  I can't recall at any

 6    given time, but between -- it could have been

 7    anywhere between 10 and I think the capacity was

 8    26, but I don't think we ever were at that level.

 9    Probably between 10 and 20, on average.

10         Q.    Okay.  So, you know, we just talked about

11    there was a three-phase system implemented in

12    2012.  Did you get any written guidelines on that

13    three-tier system?

14         A.    I could have, but I don't recall.

15         Q.    Were there any manuals given to inmates,

16    or were they given any guidelines, policies,

17    procedures on the three-tier system when they

18    entered AD?

19         A.    Yes.

20         Q.    They were given written policies and

21    procedures when they entered AD?

22         A.    What I recall, they were given a

23    memorandum that summarized the policy and the --

24    just the basic rules, how much commissary they
```

MICHAEL P. ATCHISON 6/21/2017

```
 1    could buy, what the clothing they would wear was,

 2    just describing the three phases.

 3        Q.    In 2012, when the inmates were sent to

 4    Menard, if you know, were they given written

 5    notice of the reason they were being sent and

 6    placed in AD?

 7        A.    When they were sent to Menard, no.

 8        Q.    And what about once they arrived, were

 9    they given written notice of the reason they were

10    being placed in AD?

11        A.    No.

12        Q.    Were they given written notice at anytime

13    during your tenure as warden at Menard about why

14    they were being held in AD?

15        A.    No, and it wasn't a requirement of the

16    administrative rule.

17        Q.    Were they given hearings while they were

18    at Menard?

19        A.    No.  Again, it's not -- it wasn't a

20    requirement of the rule that governed

21    administrative detention.

22        Q.    If inmates weren't given hearings, how

23    was it determine at Menard if they would advance

24    to a different phase?
```

MICHAEL P. ATCHISON  6/21/2017

```
 1      A.   Well, you asked about hearings prior to

 2   their placement.

 3      Q.   No.  So if they are placed -- well, did

 4   they have hearings while they -- I thought, maybe

 5   I misunderstood, you said they didn't have a

 6   hearing at all during the time they were housed at

 7   Menard?

 8      A.   There could have been hearings or a

 9   committee that would review their status from one

10   phase to another, but they -- at that point they

11   were not entitled by policy or practice to an

12   in-person presence at the hearing.

13      Q.   Right.

14      A.   That policy wasn't instituted until 2014.

15      Q.   Yes, I will get to that in a second, too.

16           So I just want to be clear, the inmates

17   had no input, they didn't know why they were in AD

18   while they were housed at Menard, and they had no

19   input into the basis for them being held, is that

20   correct?

21      A.   Well, I would contest that they didn't

22   know why they were in AD.  They might tell you

23   that, but if we have a preponderance of evidence

24   that shows the level of threat that they are, then
```

**MICHAEL P. ATCHISON  6/21/2017**

Page 32

```
 1  they are likely to know why they are placed in
 2  administrative detention.
 3      Q.    How would they know?
 4      A.    Because they were what they were and did
 5  what they did, they would know better than anyone.
 6      Q.    But what if it's an unidentified
 7  confidential source that says what they did, and
 8  they didn't do it, how would they know then?
 9      A.    Well, as I said, there are a multitude of
10  sources of information when an intelligence unit
11  is gathering intelligence.
12      Q.    Uh-huh.
13            But you don't know that someone came to
14  them and said, "Hello, Offender, you are being
15  held here for this reason, is this true or not?"
16      MS. HONINGFORD:  Object to form.
17  BY THE WITNESS:
18      A.    I don't understand that question.  What
19  was that question again?
20  BY MS. BLAGG:
21      Q.    Were they ever orally told why they were
22  being held in AD?  Was it a policy to tell them?
23      A.    No.
24      Q.    So how is it determined if an inmate
```

## MICHAEL P. ATCHISON 6/21/2017

```
 1    advanced to a different phase while you were at

 2    Menard?

 3        A.    Again, I can't recall specific instances

 4    of what happened, but, in general, it would be

 5    their behavior, their lack of discipline, and

 6    their overall disassociation, or lack of continued

 7    association, with the gangs or security threat

 8    groups that they were identified as being very

 9    active in previously.

10        Q.    Did Menard use a form that it filled out

11    for each review?

12        MS. HONINGFORD:   Object to foundation.

13    BY MS. BLAGG:

14        Q.    Are you aware if Menard used a form to

15    fill out for each review?

16        A.    The only form I ever received as a warden

17    was whether an offender -- it was a statewide form

18    for the continued -- continuation of

19    administrative detention status.

20        Q.    Did that form indicate their aggression

21    level, various different factors that were

22    relevant to their being held in administrative

23    detention?

24        A.    No, I don't recall that form having all
```

MICHAEL P. ATCHISON 6/21/2017

Page 52

```
 1   people that you talked about would be notified,

 2   when would they have been given this policy?

 3   Would it have been on 5/1/2014 or would it have

 4   been weeks or months before?

 5       A.   Probably 60 days before is when they

 6   started the vetting process.

 7       Q.   Okay.  So under the policy, it talks

 8   about many different things, but one of the things

 9   it does discuss is the administrative detention

10   reviews.

11           We've already covered the fact that while

12   you were warden in 2012, the inmates were not

13   given notice, they were not given a hearing where

14   they could participate.  This directive orders

15   that they are given notice and that they are given

16   a hearing.  One of the other things -- do you need

17   time to review it before I start talking about it?

18   I am sorry.

19       A.   I don't know what page you want me to

20   review.

21       Q.   Right now I am talking generally, but

22   look on Page 3 of 10.

23       A.   Okay.

24       Q.   So under Number 1, it says -- basically
```

Page 53

```
 1    it says that each offender should have an

 2    administrative detention file, right?

 3         A.   Yes.

 4         Q.   And so each offender should have had,

 5    beginning in May of 2014, each facility that

 6    housed an AD inmate should have created an

 7    administrative detention file for that offender,

 8    right?

 9         A.   Yes.

10         Q.   And what would go in that file?  Do you

11    know what would be housed in an administrative

12    detention file?  Did you review Mr. Romero's

13    before you came to testify -- I mean before the

14    deposition?

15         A.   No.  No.

16         Q.   Do you know what, generally, is in one?

17         A.   Well, I would assume, and I've seen some

18    of the document, but I would assume there would be

19    the record of the proceedings, you know, the

20    notice to the offender, when the offender was

21    given notice that they were either being placed or

22    that a hearing was upcoming, the committee's

23    review and recommendations to the warden as to

24    whether the offender stays in the level that they
```

**MICHAEL P. ATCHISON  6/21/2017**

Page 54

```
 1    are in, or upgrades or downgrades, or is released

 2    from administrative detention.  Probably some

 3    recommendations from the Intelligence Unit, if it

 4    applies, things like that.

 5        Q.    Another thing that -- give me just a

 6    second.

 7             Another thing it directs is that it sort

 8    of dictates what the committee should consider,

 9    and that's in Number 3.  It says they should

10    consider discipline reports, initial

11    administrative detention placement documents.

12    Would that be what Exhibit 1 was?  Is that the

13    administrative detention placement document?

14        A.    Yes.  I mean, that could be the initial

15    placement form for administrative detention

16    even -- the form that was used prior to this

17    policy being developed, that's probably what

18    that's alluding to.

19        Q.    And then it says an offender summary

20    prepared by the Intelligence Unit documenting

21    updates.  So maybe that would be something that

22    Exhibit 1 would look like, too?  It could look

23    like that, too?

24        A.    Oh, Exhibit 1.  I'm sorry.  Yes, that
```

**MICHAEL P. ATCHISON  6/21/2017**

```
 1    would be something similar to what the

 2    Intelligence Unit would provide.

 3         Q.   Now, would the committee consider

 4    anything outside of what's listed in Number 3?

 5         MS. HONINGFORD:   Object to foundation.

 6    BY MS. BLAGG:

 7         Q.   If you know?

 8         A.   Such as what?

 9         Q.   Would any other officers come testify in

10    front of the committee about intelligence, or

11    would they just receive a report?

12         MS. HONINGFORD:   Object to foundation.   This

13    is an incomplete hypothetical.

14    BY THE WITNESS:

15         A.   I can't think of any other type, other

16    than what's listed here, that would be considered.

17    BY MS. BLAGG:

18         Q.   To your knowledge, the committee

19    basically just hears testimony from the offender

20    and no one else, and then reviews documents.   Is

21    that fair to say?

22         A.   Yes.

23         Q.   Let's go to Page 2.   Look at H-2.   That

24    dictates that the Reviewing Committee should take
```