**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FRANCISCO ROMERO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cv-713 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| MICHAEL ATCHISON, Warden of the | ) | |
| Illinois Department of Corrections, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Francisco Romero brings this action against employees of the Illinois Department of Corrections ("IDOC") pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights. Romero moves to admit the testimony of his own expert witness, Dr. Stuart Grassian ("Dr. Grassian") [331]. For the following reasons, the Court, in its discretion, grants in part and denies in part Romero's motion.

**Factual Background**

In November of 2012, Romero was placed in administrative detention at Menard Correctional Center. Administrative detention, which consists of three phases, removes an inmate from the general prison population or otherwise restricts their access to the general population. In April 2013, Romero upgraded to Phase II of administrative detention, a less restrictive phase. In May 2013, upgraded to Phase III. Romero remained in Phase III, the least restrictive of the phases, until May 2016. As a result of his time in administrative detention, Romero contends that he suffered psychiatric harm.

**Expert Qualifications**

Dr. Grassian is a board-certified psychologist who served on the teaching faculty of the Harvard Medical School for over 25 years. His work on the psychiatric effects of solitary

confinement is extensive and his published articles on the subject have been cited in numerous federal court decisions. *See, e.g., Davis v. Ayala*, 576 U.S. 257, 289, 135 S. Ct. 2187, 2210, 192 L. Ed. 2d 323 (2015) (Kennedy, J. concurring); *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015). Dr. Grassian has given lectures and seminars regarding these issues to numerous reputable medical and legal institution, has worked with numerous public advocacy groups, and has been invited to provide testimony before state legislative hearings.

**Expert Opinions**

In his expert report, Dr. Grassian opines that "Mr. Romero's confinement in solitary[1] has caused him serious psychiatric harm." (Dkt. 33-1, at 2.) After summarizing his understanding of the conditions in which Romero was detained, he concludes that "[t]he symptoms he reports are strikingly typical of those seen among individuals confined in solitary," and that "[t]hey are also consistent with physical damage to the brain…" (*Id.* at 28.) To form those opinions, Dr. Grassian interviewed Romero for three total hours, interviewed his childhood friend for approximately one hour, and interviewed Romero's older sister for approximately one hour. He additionally reviewed relevant documents[2], including Romero's medical records, disciplinary reports, and presentence investigation report. In addition, Dr. Grassian relied on the knowledge he possesses through his research on the psychiatric effects of solitary confinement.

**LEGAL STANDARD**

Rule 702 and *Daubert* require district judges to act as gatekeepers to ensure that proposed expert testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113

---

[1] As further described in this Court's ruling on the parties' cross motions for summary judgment [314], Romero was subject to administrative detention. Defendant does not object to Dr. Grassian's characterization of the segregation as solitary confinement or dispute his findings on the basis of this distinction.

[2] Counsel neglected to include the attachments to Dr. Grassian's report in the motion, including, among other things, a list of documents the expert reviewed. (Dkt. 33-1, at 1.) The Court supplements its understanding of Dr. Grassian's methodology through his deposition testimony. (Dkt. 347, at 15.)

S. Ct. 2786, 125 L. Ed. 2d 469 (1993). When determining reliability, the Court's role is to assess if the expert is qualified in the relevant field and to examine the methodology he used in reaching his conclusions. *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). To be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Once the district court determines that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596). The expert's proponent has the burden of establishing the admissibility of his opinions by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

## ANALYSIS

Before the Court is Plaintiff's affirmative motion in limine to admit Dr. Grassian's expert testimony. Because Defendants object to the admission of the testimony under Federal Rule of Evidence 702, the Court treats this as a *Daubert* motion. Defendants concede that Dr. Grassian is qualified to examine and diagnose Plaintiff and instead argue that his opinions are not reliable. Here, the "critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert,' that is properly excluded under Rule 702." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (quotation omitted). The Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

Defendants argue Dr. Grassian's examination was improper because it was conducted remotely over two sessions three years after Romero's release from administrative detention and relied on Romero's self-reported symptoms. First, that Dr. Grassian did not interview Romero directly after his release from administrative detention does not preclude his findings. Dr. Grassian properly evaluated Romero's behavior before administrative detention in comparison to his release. *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000).

Further, as has become increasingly clear during the ongoing public health crisis, video technology may serve as a reliable method of examination. *See* Donald Hilt et al., *The Effectiveness of Telemental Health: A 2013 Review*, Telemedicine J. & E-Health, vol. 19(6), June 2013, at 444–45 ("[Telemental health services] are effective for diagnosis and assessment, across many populations [ ], and in disorders in many settings [ ], are comparable to in-person care, and complement other services in primary care."). Dr. Grassian's reliance on information gathered through patient and family interviews, including Romero's own reports of his symptoms, is likewise appropriate. *See Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) (citation omitted) ("Medical professionals reasonably may be expected to rely on self-reported patient histories."); *Manpower, Inc.*, 732 F.3d at 806 (the Court assesses "the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced"). Further, according to Dr. Grassian and without contrary evidence from Defendants, conducting interviews of the subject and their friends and family is a standard practice in his field. (Dkt. 347, at 57.) Finally, Dr. Grassian explains that his analysis was predicated not only on Romero's statements of the symptoms he experienced, but also his clinical presence at the time of the interview. (*Id.* at 13.)

Next, Defendants contend Dr. Grassian does not conclude in his report that Romero in fact suffered a physical injury. Plaintiff disagrees, maintaining that Dr. Grassian opined Romero suffered a serious psychiatric harm, which he later described as involving physical damage to the brain itself.

4

Dr. Grassian's primary opinion is that Romero's symptoms "are strikingly typical of those seen among individuals confined in solitary." (Dkt. 331-1, at 28.) He goes on to conclude that the symptoms are also "consistent with physical damage to the brain," but his report lacks an explicit determination that Romero's brain was damaged. Dr. Grassian's deposition testimony confirms the limitations of his opinion. When asked by defense counsel whether he concluded Romero's brain was actually damaged, Dr. Grassian stated, "[n]o. My opinion is that he's got increased risk for physical damage to the brain." (Dkt. 347, at 55–56.) He further testified that "[t]here is research evidence [sic] that there's physical damage to the brain associated with solitary confinement, and while I cannot make an opinion to a reasonable degree of medical certainty in Mr. Romero's case, certainly one would be concerned about that as a possibility or likelihood." (*Id.* at 56.) While Dr. Grassian may testify about the potential for solitary confinement to cause a physical brain injury and the similarity of Romero's injuries, an opinion as to whether Romero actually suffered brain damage is not supported.

Dr. Grassian's final opinion is that Romero's administrative detention served as the cause of his psychiatric harm. Defendants argue Dr. Grassian's causation conclusions are improper because he failed to consider other potential causes of the harm. Differential etiology, the process by which an expert determines the cause of an injury, requires the expert "systematically 'rule in' and 'rule out' potential causes in arriving at her ultimate conclusion." *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015). The Court has discretion to consider "whether the expert has adequately accounted for obvious alternative explanations." *Brown*, 765 F.3d at 765 (citation omitted). Defendant does not suggest that there were obvious alternative causes for Romero's psychiatric harm but rather that Dr. Grassian failed to consider whether any existed. To the contrary, Dr. Grassian relied upon his interviews and Romero's medical records to determine that Romero suffered no prior history of medical, psychiatric, or neurological difficulties consistent with his post-administrative detention

symptoms.  (Dkt. 347, at 52).  In addition, the fact that Romero's symptoms are "not typical of the psychiatric symptoms found in ordinary clinical practice" weighs in favor of reasonableness of the scope of Dr. Grassian's consideration of alternative causes.  (Dkt. 331-1, at 11.)  Therefore, Dr. Grassian's causation opinion is proper under Rule 702.

**Conclusion**

Based on the foregoing, the Court, in its discretion, denies Romero's motion [331] to the extent he seeks to admit the expert testimony of Dr. Stuart Grassian that he suffered a physical brain injury.  To the extent that Romero seeks to admit the expert's testimony that he suffered psychiatric harm caused by administrative detention, the motion is granted.

Date: 6/15/2022

Entered:  _____

SHARON JOHNSON COLEMAN
United States District Judge